Filed 7/28/25 (see dissenting opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>ROYCE DAY GRESHAM,<br><br>     Defendant and Appellant. | B332270<br><br>(Los Angeles County<br>Super. Ct. No. MA083113-01) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa Strassner, Judge. Affirmed.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

In his appeal, appellant Royce Gresham asks us to strengthen the elements that must be proven to convict a defendant of willfully resisting arrest under Penal Code section 148, subdivision (a). He contends that such a conviction must require proof that a defendant "actually knew" that the person being resisted was a peace officer acting in the lawful performance of official duties. We disagree and hold that section 148, subdivision (a) requires that a jury find only that a defendant "knew or reasonably should have known" that the person they were resisting was a peace officer acting in the lawful performance of official duties. Further statutory references are to the Penal Code.

## BACKGROUND

### I. *Facts*

We recite the evidence presented at trial. On May 6, 2022, Royce Gresham drove his car into the ground floor bedroom wall of Alix and Jose S., a married couple whose apartment was next door to his. Alix and Jose[1] were in the bedroom at the time of the crash. Covered with dust and drywall, they stepped out of the building relatively unhurt.

When they stepped out of the building, Jose saw their son Anthony and appellant Gresham fighting. Jose intervened, telling his son "everything is fine." The men were near Jose's car in the carport when they stopped fighting.

Amber T. lived above Alix and Jose and was Anthony's friend. She heard a loud bang that afternoon and saw that a car

---

[1] Alix, Jose, and Anthony share the same last name. To avoid confusion, we call them by their first names.

has crashed into Alix and Jose's apartment.  She recognized the car as Gresham's.  Other neighbors came out to see what happened.  Amber called 911 to report the accident.

Amber saw Anthony and Gresham fighting.  She heard Anthony say, "You could have killed my fucking dad."  Gresham was on the ground at this point and Jose was trying to calm them down.  Amber noted that Gresham, normally calm and neighborly, appeared distraught, emotional, and upset.

Alix also saw the fight between Anthony and Gresham.

Anthony testified he was in the carport with his sister-in-law around the time of the crash when he saw people coming out of their apartments.  He was told that someone had crashed a car into his parents' apartment.  Anthony ran and saw the car situated partly inside the apartment.  He saw that it was Gresham's car.  He also saw Gresham in the middle of the street.

Anthony testified he encountered Gresham near the accident site and threatened to call the police.  Gresham said, "Don't call the cops."  Gresham pulled out a pocketknife and Anthony then threatened him.  Anthony went to check on his parents and Gresham approached Alix and Jose, apologized to them, and asked if they were ok.  Anthony told Gresham to "back away.  You could have killed them."

Anthony smelled alcohol on Gresham.  When Gresham did not move, Anthony pushed him and punched him multiple times.  Gresham asked him to stop.  Anthony kicked Gresham and dislodged the knife from Gresham's hand.  Gresham retrieved the knife and the two kicked and punched each other.  The fight stopped before deputies arrived on the scene.  Anthony testified Gresham scratched Jose's car and broke the overhead lights in the parking area.

Before the incident, uniformed sheriff's deputies Jacob Winter and Dillan Williams were patrolling the area in a marked car. They were wearing body cameras, utility belts, firearms, and badges. They were dispatched to investigate a report of a traffic collision with a possible assault with a deadly weapon. They activated their siren and arrived at the scene with lights flashing. They turned off the siren about 100 yards before stopping. When they arrived, they saw a large crowd of people in a parking lot. People in the crowd were pointing in a certain direction. The deputies saw no fighting. They began to try to discover who and where the suspect was.

Jose had grabbed Gresham by the wrist as he was trying to calm Anthony and Gresham down. Deputy Winter told him "let me handle it" so Jose let Gresham go. Gresham backed away from Jose and Deputy Winter, who grabbed Gresham from behind.

As recorded on the body cameras, Deputy Winter told Gresham: "Hey. Turn around, turn around." Gresham answered repeatedly, "I'm not doing nothing." Deputy Winter told Gresham, as he struggled: "Stop fighting, stop fighting," Gresham kept pulling away. Deputy Winter could not control Gresham's arms to subdue or detain him.

Deputy Winter asked Deputy Williams to help him. The plan was to detain and handcuff Gresham so they could investigate the alleged assault with a deadly weapon. As they attempted to handcuff Gresham, Deputy Winter struggled to control Gresham's arms as Gresham resisted being touched. Deputy Williams had come to the scene with a "less lethal impact launcher." As the deputies tried to get Gresham on the ground, Gresham repeatedly pulled his arms towards his stomach while

4

clenching his fists. The deputies repeatedly told Gresham to stop resisting and to put his arms behind his back. Gresham did not comply. They saw a white ring around Gresham's mouth and concluded from his appearance and odor that he was under the influence of methamphetamine and alcohol. They were prepared to administer the drug Narcan in case Gresham overdosed.

A third officer, Deputy Schaafsma, arrived and put his taser against Gresham, warning him that he would be tased if he did not comply with their orders. (Ultimately the taser was not used.) The deputies grabbed Gresham's arms and took his body to the ground. Gresham's face ended up with his head under a Dodge Charger in the carport.

At one point, Gresham lost consciousness and was not responsive. The deputies handcuffed Gresham who was struggling to breathe as he was lying on his chest. Once Gersham was handcuffed, the deputies put him in a sitting position where he could breathe. Gresham sat there fidgeting, mumbling, and not making sense. Deputy Williams asked Gresham, "What did you take?" Gresham did not answer and told Deputy Williams, "Get your hands off me." Gresham appeared to be attempting to throw up, which the deputies deemed another sign that Gresham was under the influence. They noted his pupils were enlarged and he was grinding his teeth, which Deputy Williams interpreted as a sign of a methamphetamine overdose. Deputy Williams rubbed Gresham's chest, a first aid tactic called a sternum rub. They also had Narcan ready to administer if necessary.

An ambulance took Gresham to the hospital. None of the deputies saw a knife in Gresham's hand or saw him try to stab anyone. The struggle to detain Gresham was caught on the body

5

cameras of the deputies. The video was shown to the jury. Deputies Winter and Williams completed the traffic collision investigation, concluding that an "unsafe turning movement with the speed caused [Gresham] to lose control and go over the sidewalk curb and into the building."

At trial, Gresham testified that he suffers from schizoaffective disorder and he had not taken his monthly medication on that day. He injured his head when he collided with the apartment building and his airbag deployed. He hit his head on the car window very hard. As a result, he could not see straight and was confused. He took out his knife to defend himself against Anthony's attack on him. He did not run away after he crashed into the apartment building, was not under the influence of drugs or alcohol, and he did not know that the deputies were police officers when he resisted them. He did not hear them identifying themselves, telling him he was under arrest, or giving him orders. He was just trying to get away from anyone grabbing him.

Gresham's expert, clinical and forensic psychologist Lydia Bangston, testified about the symptoms of schizoaffective disorder. She confirmed a diagnosis of schizoaffective disorder, depressive type, and cannabis use disorder. She also testified that dilated pupils and teeth grinding are symptoms of a medical condition, not a mental disorder.

## II.  *Procedure*

The People charged Gresham in count 1 with assault with a deadly weapon (§ 245, subd. (a)(1)) (referring to the knife confrontation with Anthony); in count 2 with misdemeanor vandalism (§ 594, subd. (a)) regarding the alleged car scratch; in count 3 with misdemeanor resisting arrest (§ 148, subd. (a)(1));

6

and in count 4 with hit and run (Veh. Code, § 20001, subd. (b)(1)) on the theory that Gresham ran after hitting the bedroom wall with his car.

In August 2022, Gresham filed a *Pitchess*[2] motion for information about complaints of excessive force against Deputies Winter, Williams, and Schaafsma.

Jury trial began in June 2023. Alix and Jose, Amber T., Anthony, Deputies Winter and Williams, and Gresham testified. Deputies Winter and Williams described interacting with Gresham and authenticated their body-camera videos, which the jury watched.

The court's instructions included CALCRIM No. 2656 (Resisting Peace Officer, Public Officer, or EMT) and CALCRIM No. 2671 (Lawful Performance: Custodial Officer).

The trial court's version of CALCRIM No. 2656 included the element that, "[w]hen the defendant acted, he knew, or reasonably should have known, that Deputy Jacob Winter was a peace officer performing or attempting to perform his duties."

CALCRIM No. 2671, as the trial court gave it, stated that, "[i]f a person knows, or reasonably should know, that a peace officer is restraining him or her, that person may not use force or any weapon to resist an officer's use of reasonable force."

The jury convicted Gresham of resisting arrest in violation of section 148. The jury acquitted him of assault with a deadly weapon (the alleged knife attack) and the car-scratch vandalism, and hung on the hit-and-run count, which the court dismissed.

---

[2]      *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

## DISCUSSION

Gresham contends insufficient evidence supports his conviction for resisting arrest because the evidence did not establish that he actually knew he was resisting a peace officer. He also contends the trial court improperly denied Gresham's *Pitchess* motion. We disagree with both contentions.

### I. ***The Conviction is Supported by Substantial Evidence.***

Section 148, subdivision (a)(1) provides: "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

The elements of a violation of section 147, subdivision (a) are: (1) the defendant willfully resisted, delayed, or obstructed a peace officer; (2) the officer was engaged in the performance of his or her duties; and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties. (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329; *People v. Simons* (1996) 42 Cal.App.4th 1100, 1108–1109.)

Here Gresham contends that the knowledge element (the third element, *ante*) is insufficient. He argues that a defendant must *actually* know that the other person is a peace officer engaged in official duties in order to be found guilty of the offense.

8

The "knew or reasonably should have known" element arises from *People v. Lopez* (1986) 188 Cal.App.3d 592 (*Lopez*).  In *Lopez*, appellant argued that substantive due process requires that knowledge that the person being resisted is a peace officer be an implied element in the statute.  Otherwise, people could be found guilty of resisting arrest without realizing that someone is in fact a police officer.  (*Id.* at p. 596.)

The *Lopez* court agreed to a point: "Merely running away from someone is not resisting arrest.  Running from a plainclothes officer who does not identify that he or she is an officer could not, for instance, be a crime." (*Lopez, supra,* 188 Cal.App.3d at p. 598.)  The court held: "Before one can be found culpable, however, he or she must know, or through the exercise of reasonable care should have known, that the person attempting to make the arrest is an officer.  Otherwise the statute is overbroad.  It would make mere flight or fear of capture an offense." (*Id.* at p. 599.)

Gresham asks us to reject *Lopez,* pointing out that not all courts have adopted the *Lopez* "knew or reasonably should have known" as the third element.  He cites *In re A.L.* (2019) 38 Cal.App.5th 15 (*A.L.*), which analyzed the elements for section 148, subdivision (a)(1), expressly rejected *Lopez,* and held section 148 subdivision (a)(1) "requires that a defendant have *actual knowledge* he or she is resisting an officer in the performance of duty." (*A.L.,* at p. 22, italics added.)  The *A.L.* court stated it had to give effect to the statute as written, not as it might have or should have been written, and it therefore interpreted "willfully" to require "that a defendant have *actual knowledge* he or she is resisting an officer in the performance of duty." (*Ibid.*)

At least two courts have rejected *A.L.* and endorsed *Lopez.* (*People v. Mackreth* (2020) 58 Cal.App.5th 317, 332–336 (*Mackreth*); *People v. Serna* (2025) 109 Cal.App.5th 563 (*Serna*).) *Serna* agreed with *Mackreth* and held "section 148(a)(1) does not require the defendant knew they resisted, delayed, or obstructed a police officer. It is enough for a jury or trier of fact to find the defendant *knew or reasonably should have known* the person they resisted was a police officer." (*Serna,* at p. 567, italics added.) In so holding, the *Serna* court noted that our Supreme Court in dicta endorsed "knew or reasonably should have known" when it described the elements that must be proven in a criminal prosecution under section 148, subdivision (a). (*Serna*, at p. 577, quoting *Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 895.)

We adopt the holding and analysis of *Mackreth* and *Serna.* We also note that the Legislature has amended section 148 multiple times (1987, 1989, 1997, 1999, 2011) since the 1986 *Lopez* decision, which added "knew or reasonably should have known" as an element to be proven at trial. The Legislature has not taken the opportunity in any way to alter or reject Lopez's holding. Nor has it corrected or repudiated the dicta in the *Yount* decision of 2008. (Stats. 1987, ch. 257, § 1; Stats. 1989, ch. 1005, § 1; Stats. 1997, ch. 464, § 1 (Senate Bill No. 57); Stats. 1999, ch. 853, § 8 (Senate Bill No. 832); Stats. 2011, ch. 15, § 258 (Assembly Bill No. 109.)

Applying the "knew or reasonably should have known" element to Gresham's case, we find the evidence substantially supports Gresham's conviction. It is undisputed that the officers arrived on the scene in a marked police car with sirens and lights on. They were also dressed in uniforms with weapons in plain view. Gresham relies on his testimony that he sustained a head

10

injury during the crash, confusing him, and his back was to the officers when they approached him, so that he did not see them in their uniforms when he resisted their attempts to restrain him. He does not explain how or why he would not have heard or seen the lights and sirens when the officers pulled up. In any event, this was a factual determination for the jury which we do not disturb under the applicable standard of review: we review the evidence in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) Indeed, it is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. The appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding. (*Id.* at p. 1139.) Under this standard of review, we are satisfied that substantial evidence supports the jury's verdict.

II.     ***The Trial Court Properly Denied the Pitchess Motion.***

Gresham argues it was prejudicial error for the trial court to deny his *Pitchess* motion for discovery relating to the deputies involved in his arrest. In his motion, Gresham claims evidence of excessive force and false reporting by the deputies would have helped him prove the deputies used excessive force against him.

11

We deferentially review the trial court's decision on a *Pitchess* motion. (*People v. Nguyen* (2017) 12 Cal.App.5th 44, 47.) The trial court properly denied Gresham's *Pitchess* motion. Gresham failed to meet his initial burden of showing a plausible factual foundation for the discovery. (See *Mackreth*, *supra*, 58 Cal.App.5th at p. 341.)

In *Mackreth*, the trial court affirmed the denial of the defendant's *Pitchess* motion because there was video documentation of the encounter between the defendant and three police officers, and the defendant "fail[ed] to address the materiality of the requested discovery in light of the undisputed content of the videos." (*Mackreth*, *supra*, 58 Cal.App.5th at p. 341.) There was no point in furnishing discovery because it would not have assisted the defendant in presenting a defense. (*Id.* at pp. 341–342.)

Here, as in *Mackreth*, video cameras captured Gresham's interactions with Deputies Winter, Williams, and Schaafsma. Gresham could not credibly dispute the content of these videos, nor did he offer a plausible alternative scenario of excessive force by the deputies that somehow escaped the cameras. There was no evidence Deputies Winter and Williams used excessive force in their efforts to detain Gresham or that they made false reports about the incident. There was no justification for this discovery. (See *Mackreth*, *supra*, 58 Cal.App.5th at pp. 341–342.)

The trial court properly denied the *Pitchess* motion.

**DISPOSITION**

The judgment is affirmed.

**CERTIFIED FOR PUBLICATION**


STRATTON, P. J.

I concur:


VIRAMONTES, J.

**Wiley, J., Concurring in the result.**

A statute outlaws "willfully" resisting arrest.

The importance of proper statutory interpretation transcends the factual particulars of this case, for the potential for this criminal charge lurks every time police interact with the public. This occurs constantly.

These interactions can explode. The "sensitive realities of police-citizen contacts" include the fact that "unilateral decisions by officers in the field are rife with the dangerous potential for overreaching, arbitrary harassment, and the violation of individual rights. [...] Misunderstandings may arise in the heat of the moment about the officer's intentions, motives, good faith, and authority. A citizen confronted in such circumstances may have a colorable basis for belief that the unilateral police attempt to restrict his freedom or invade his privacy is arbitrary and wrongful." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1220 (*Gonzalez*).)

The Supreme Court's decision in *Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 894–895 (*Yount*) noted the resisting-arrest statute here has three elements. The Courts of Appeal are well-advised to follow every word from the Supreme Court. Applying *Yount*'s mention of the elements, we must affirm.

After the 2008 *Yount* decision, however, a split developed in lower courts over the proper definition of the statute's elements. If *Yount*'s mention of the elements is not authoritative, courts should construe "willfully," in this context, to mean "recklessly" as the Model Penal Code precisely defines this state of mind. Under this interpretation, we must also affirm. This second path

to affirmance, however, yields a difference in elements.  In some future case, this will be paramount.

## I

The text of the statute is always the starting point. Statutory citations are to the Penal Code.  We therefore turn to the unedited text of subdivision (a)(1) of section 148:

"Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

Boiling it down and adding italics, the key statutory words for this case are:  "Every person who *willfully* resists any . . . peace officer . . . in the discharge . . . [of] any duty of . . . office . . . shall be punished . . . ."

The only mental state word is "willfully."  And there is the issue.

## II

In its 2008 *Yount* decision, the California Supreme Court quoted a Court of Appeal decision as setting forth three elements of section 148, subdivision (a)(1):  "(1) the defendant *willfully* resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant *knew or reasonably should have known* that the other person was a peace officer engaged in the performance of his or her duties." (*Yount*, *supra*, 43 Cal.4th at pp. 894–895,

2

quoting *In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329, which in turn quoted *People v. Simons* (1996) 42 Cal.App.4th 1100, 1108–1109 (*Simons*), italics added.)

The cited *Simons* decision took these elements, verbatim and without discussion, from *People v. Lopez* (1986) 188 Cal.App.3d 592, 600, fn. 3 (*Lopez*).

So the lower court opinion in *Lopez* is the taproot.

The *Lopez* opinion grappled with the elements of the resisting-arrest statute and rejected the prosecution's argument that it was enough to show the defendant's acts were merely *voluntary*. (*Lopez*, *supra*, 188 Cal.App.3d at pp. 596–600.) Repeatedly citing the landmark decision authored by the revered Justice Traynor in *People v. Vogel* (1956) 46 Cal.2d 798 (*Vogel*), the *Lopez* decision refused to interpret this penal statute in a way that would criminalize conduct that was "entirely innocent." (*Lopez*, *supra*, 188 Cal.App.3d at pp. 597–599, 602.)

*Lopez*'s reliance on *Vogel* was of great moment. In *Vogel*, Justice Traynor, writing for the California Supreme Court, explained that "good sense and justice" made it "extremely unlikely that the Legislature meant to include the *morally innocent* to make sure the guilty did not escape." (*Vogel*, *supra*, 46 Cal.2d at p. 804, italics added.)

In other words, the high court in *Vogel* interpreted the criminal statute in that case with *the presumption that moral culpability was mandatory*. This interpretative canon is *the presumption of mandatory culpability*. (Cf. Scalia & Garner, Reading Law: The Interpretation of Legal Texts (2012) p. 303 ["Mens Rea Canon"].)

As with so many of Justice Traynor's signal contributions, his foundational effort in *Vogel* laid the groundwork for a

nationwide series of cases following in his footsteps.  Nearly a score of landmark decisions from the Supreme Courts of California and the United States expressly cite, or are doctrinally consistent with, *Vogel* and its interpretative canon.  (See *People v. Canales* (2024) 106 Cal.App.5th 1230, 1239–1243 (*Canales*) [reviewing high court decisions in the wake of *Vogel*].)

Following *Vogel*, the *Lopez* decision explained why culpability is mandatory.  Were it not, courts could interpret the Legislature's statutes to criminalize morally innocent behavior.

In other words, blameless people could end up in prison.  This would be unjust.  Because it is unlikely the Legislature intended injustice when it crafted the statute, the *Vogel* approach presumes culpability is mandatory.  Thus we have the presumption of mandatory culpability as a cardinal rule of statutory interpretation in criminal law.

The *Lopez* opinion illustrated this point.  "Merely running away from someone is not resisting arrest.  Running from a plainclothes officer who does not identify that he or she is an officer could not, for instance, be a crime."  (*Lopez*, *supra*, 188 Cal.App.3d at p. 598.)

The *Lopez* court therefore construed the offense of "willfully" resisting arrest to require the prosecution to prove the defendant's *negligence*.

"In the instant action, the act of fleeing from an officer trying to make a lawful arrest is proscribed.  Before one can be found culpable, however, he or she must know*, or through the exercise of reasonable care should have known*, that the person attempting to make the arrest is an officer.  Otherwise the statute is overbroad.  It would make mere flight or fear of capture

4

an offense." (*Lopez, supra,* 188 Cal.App.3d at p. 599, italics added.)

We shall return to *Vogel* and *Lopez.*

For the moment, however, let us go back to the Supreme Court decision in *Yount.* The elements list originating in *Lopez* was not a disputed issue in *Yount. Yount*'s focus was elsewhere.

The controversy in *Yount* was whether a no-contest plea to a criminal section 148 offense would bar a later civil suit against a police officer for using excessive force. This *civil* issue was factually complex because the drunken Yount had resisted arrest over a prolonged interval. Initially, police used appropriate force to subdue Yount, but he continued to struggle. Officer Thomas Shrum eventually decided to use his taser on Yount, but mistakenly shot Yount with a gun. Yount survived and sued for excessive force. Shrum and his employer argued Yount's no-contest plea barred Yount's civil suit, because Yount could not relitigate his underlying criminal case. Yount replied that the official use of deadly force was improper and actionable.

This claim preclusion point was the issue in *Yount.*

Whether *Yount*'s recitation of the elements was or was not technically a holding, however, is not decisive for present purposes. It is crucial that lower courts scrupulously study and obey the precedents of the Supreme Court. Supreme Court holdings have mandatory force. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Lower courts are well-advised, by customary and proper respect, to hew to Supreme Court dicta. The Courts of Appeal are inferior courts in a hierarchical system of rules. The hierarchy is central to the rule of law. The court at the pinnacle can resolve conflicts in the lower courts and thus produce a coherent, uniform, and

5

predictable system of law. On all matters except constitutional ones, and even there with exceptional measures, this system of law is subject to oversight and amendment by democratic control. This is our democracy at work.

Applying the three statutory elements stated in *Yount* to the facts of this case dictates affirmance, as my esteemed colleagues ably illustrate.

III

Since the 2008 decision in *Yount*, the Courts of Appeal have disagreed about the proper interpretation of this statute.

The decision in *In re A.L.* (2019) 38 Cal.App.5th 15, 22 (*A.L.*) analyzed the elements for section 148, subdivision (a)(1) and rejected *Lopez*.

In *A.L.*, 16-year-old A.L. attacked an officer. The prosecution alleged A.L.'s various offenses included a violation of section 148. The superior court agreed. (*A.L., supra,* 38 Cal.App.5th at p. 19.) On appeal, the *A.L.* opinion held section 148 subdivision (a)(1) "requires that a defendant have *actual knowledge* he or she is resisting an officer in the performance of duty." (*Id.* at p. 22, italics added.) The *A.L.* court stated it had to give effect to the statute as written, not as it might have or should have been written, and it therefore interpreted "willfully" to require "that a defendant have *actual knowledge* he or she is resisting an officer in the performance of duty." (*Ibid.*)

*A.L.* frankly acknowledged its holding conflicted with the 1986 *Lopez* decision, "which held the intent element of Penal Code section 148, subdivision (a)(1) is *criminal negligence*— 'knows or should know.'" (*A.L., supra,* 38 Cal.App.5th at p. 22, italics added.)

6

*A.L.* criticized the logic in *Lopez.* "*Lopez* appears to have adopted a criminal negligence standard from the language of Penal Code section 834a, a statute imposing a generalized duty to not resist arrest . . . . But section 834a is a different statute. Its language should not be imported to define the offense created by section 148, subdivision (a)(1), particularly when the Legislature specified a different mental state—willfulness—as the intent element for that offense." (*A.L., supra,* 38 Cal.App.5th at p. 23.)

*A.L.*'s criticism was trenchant. (Cf. *Gonzalez, supra*, 51 Cal.3d at p. 1219 [§ 834a at most eliminated the common law defense of resistance to unlawful arrest and did not make resistance a new substantive crime].)

The conflict in the Courts of Appeal became more pronounced in 2020. The 2020 *Mackreth* opinion criticized the 2019 *A.L.* decision. (*People v. Mackreth* (2020) 58 Cal.App.5th 317, 332–336 (*Mackreth*).) *Mackreth* rejected *A.L.*'s holding, embraced *Lopez*, and held "knew, or reasonably should have known" is the requisite mental state for this offense. (*Id.* at p. 328.)

Thereafter, the decision in *People v. Serna* (2025) 109 Cal.App.5th 563 (*Serna*) joined with *Mackreth* in rejecting *A.L.*'s "actual knowledge" standard. *Serna* agreed with *Mackreth* and held "section 148(a)(1) does not require the defendant knew they resisted, delayed, or obstructed a police officer. It is enough for a jury or trier of fact to find the defendant *knew or reasonably should have known* the person they resisted was a police officer." (*Id.* at p. 567, italics added.)

*Serna* cited *Yount* with a qualification: "Moreover, we note that the near-universal adoption of the knowledge requirement from *Lopez, supra,* 188 Cal.App.3d 592, *including the (at least*

*implied) imprimatur given the rule by our Supreme Court in Yount v. City of Sacramento, supra,* 43 Cal.4th at page 895, strongly counsels against adopting the contrary holding in *A.L.*” (*Serna, supra*, 109 Cal.App.5th at p. 577, italics added.)

Let us summarize the key points just covered.

- The statute uses the lone mental state word “*willfully*.”
- *A.L.* interpreted “willfully” to mean “*actual knowledge*.”
- The decisions in *Lopez*, *Mackreth*, and *Serna* interpreted “willfully” to mean simple and unelaborated *negligence*:  “It is enough for a jury or trier of fact to find the defendant *knew or reasonably should have known* the person they resisted was a police officer.”  (*Serna, supra,* 109 Cal.App.5th at p. 567, italics added.)

Invoking this conflict, the parties in this appeal chose sides for advantage.  Gresham backs *A.L.* and its “actual knowledge” standard, while the prosecution urges *Mackreth* and its negligence interpretation.  No party cites *Yount*.

IV

What should we make of this conflict between our colleagues on the Court of Appeal?

Holmes said the law is a prophecy of what the courts will do in fact.  (Holmes (1897) *The Path of the Law* 10 Harv. L.Rev. 457, 460–461.)

Following Holmes, the best prophecy of Supreme Court analysis flows from four conventional steps of analysis.

The four steps of analysis are these:

8

1. Interpret the statute using the canons of interpretation, including *the presumption of mandatory culpability*.
2. Avoid the terms "general intent" and "specific intent" as unnecessary and confusing.
3. Use the Model Penal Code's precision to formulate the statute's requisite state of mind.
4. Select "recklessness," as defined in the Model Penal Code, as the state of mind required for subdivision (a)(1) of section 148.

We proceed through these four steps.

A

Courts typically review sufficiency-of-the-evidence challenges under the deferential substantial evidence standard, but independently review legal determinations, like the one in this case, that turn on statutory interpretation. When interpreting statutes, the court's fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. Courts first examine the statutory language, giving it a plain and commonsense meaning. If the language is clear, courts generally must follow its plain meaning unless a literal interpretation would result in absurd consequences. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. In pursuit of legislative purpose, the court also considers portions of a statute in the context of the statutory scheme as a whole. (*People v. Reynoza* (2024) 15 Cal.5th 982, 989–990.)

Applying that method here, we first devote attention to the statutory text of the resisting-arrest statute.

Reexamine the key statutory words for this case:  "Every person who *willfully* resists any . . . peace officer . . . in the discharge . . . [of] any duty of . . . office . . . shall be punished . . . ."

The only mental state word is "willfully."  This is the heart of the issue.

The California Penal Code defines "willfully":

"The following words have in this code the signification attached to them in this section, unless otherwise apparent from the context:  (1) 'Willfully,' when applied to the intent with which an act is done or omitted, implies simply *a purpose or willingness to commit the act*, or make the omission referred to.  It does not require any intent to violate law, to injure another, or to acquire any advantage."  (§ 7, subd. (b), italics added.)

In its *Atkins* decision, our Supreme Court stated the words "willful" or "willfully" in penal statutes require only that the illegal act or omission occur "intentionally," without regard to motive or ignorance of the act's prohibited character.  (*People v. Atkins* (2001) 25 Cal.4th 76, 85 (*Atkins*).)  Willfully implies no evil intent.  It implies defendants knew what they were doing, intended to do what they did, and were free agents.  (*Ibid.*)

This specification is what the Model Penal Code calls the requirement of a "voluntary act":

"(1) A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act of which he is physically capable.

"(2) The following are not voluntary acts within the meaning of this Section:

"(a) a reflex or convulsion;

"(b) a bodily movement during unconsciousness or sleep;

"(c) conduct during hypnosis or resulting from hypnotic suggestion;

"(d) a bodily movement that otherwise is not a product of the effort or determination of the actor, either conscious or habitual." (Model Pen. Code, § 2.01, subds. (1-2).)

"[T]o constitute what the law deems a crime there must concur both an evil act and an evil intent." (*People v. Harris* (1866) 29 Cal. 678, 681.)

In 1872, California enacted section 20, which provides that, for every crime, there must exist a union, or joint operation, of act and intent, or criminal negligence.

The classical combination of actus reus and mens rea requires an *act* plus a *culpable mental state*. But the actus reus requirement demands a *voluntary* act, for actions that are not voluntary cannot be criminal. (See § 26 [no criminal liability for "[p]ersons who committed the act charged without being conscious thereof"]; *People v. Newton* (1970) 8 Cal.App.3d 359, 376 ["unconsciousness is a complete defense to a charge of criminal homicide"].)

To this point, then, it appears the only requirement in the statute is that the defendant's acts be volitional rather than involuntary. Beyond that, the statute's text does not specify *any* required mental state.

Legislative history does not illuminate the mental state required to offend this statute. The *Mackreth* opinion analyzed section 148's legislative history. (*Mackreth, supra,* 58 Cal.App.5th at pp. 331–334.) *Mackreth*'s conclusion was this history supported its interpretation of "willfully" as requiring a

11

negligence standard: when the defendant acted, he knew, or *reasonably should have known*, that the person he was resisting was a police officer performing or attempting to perform his duties. (*Id.* at pp. 328–334.) Nothing in the *Mackreth* account of legislative history, however, mentions or suggests a standard of negligence.

Nor did *Mackreth* square its conclusion about negligence with Supreme Court cases like *Atkins*, which held that "willfulness" requires merely voluntary action.

Moreover, the *Mackreth* analysis drew an inference from legislative *silence*: after the 1986 *Lopez* decision, the Legislature did nothing. (*Mackreth*, *supra,* 58 Cal.App.5th at p. 332 [the Legislature left the "willfully" wording "unaltered," which is a "strong indicator" of meaning].)

Inferences of this kind, however, lack logical force because silence is usually ambiguous. (Cf. Krishnakumar (2016) *The Sherlock Holmes Canon* 84 George Wash. L.Rev. 1, 22–39 [surveying weaknesses in the "Silver Blaze" inference from the "dog that did not bark in the night"].) Absent evidence the Legislature knew about and considered this *Lopez* holding, the fact the Legislature did nothing to subdivision (a)(1) in the years since 1986 is insubstantial evidence about the proper meaning of section 148, subdivision (a)(1).

Legislatures are busy institutions. The notion legislative inaction signifies silent approval of *Lopez* is unrealistic.

2

The Supreme Court is unlikely to interpret "willfully" in section 148 to mean merely "voluntary," with no requirement of culpability. The better prediction is that the interpretative tradition Justice Traynor introduced in *Vogel* would hold sway.

12

This interpretative tradition avoids construing statutes to inculpate "morally innocent" conduct. (*Vogel, supra*, 46 Cal.2d at p. 804.) The *Lopez* decision was sensitive to this point, as noted. (*Lopez, supra,* 188 Cal.App.3d at p. 599.) But *Lopez* got it only partly right, in my respectful estimation, as explained below.

We must apply the presumption of mandatory culpability, as our Supreme Court has done many times since the 1956 *Vogel* decision. (See *Canales, supra*, 106 Cal.App.5th at pp. 1239–1243 [reviewing cases].)

The presumption of mandatory culpability requires courts to interpret criminal statutes in a way that avoids potentially inculpating "morally innocent" conduct. (*Vogel, supra,* 46 Cal.2d at p. 804.) As *Lopez* noted, that requires a mental state of greater culpability than merely voluntary behavior.

3

Exactly how to define that requisite higher level of culpability, however, requires further analysis, and this is where the *Lopez* decision faltered.

The statutory word "willfully" alone does not provide reliable guidance.

Unfortunately, the word "willful" is famously ambiguous. A long history proves it.

Earlier, we quoted the *Atkins* opinion's interpretation of the word "willfully." But our Supreme Court also has stated that "the meaning of the term 'willfully' *varies depending on the statutory context.*" (*People v. Garcia* (2001) 25 Cal.4th 744, 753, italics added (*Garcia*).) The *Garcia* court quoted the statutory definition of the word from section seven. (*Id*. at pp. 751, 753–754.) However, the high court held a jury instruction relying only on this definition was "incomplete." (*Id*. at p. 754.)

A word that changes meaning "*depending on the statutory context"* is ambiguous.  Predictable law requires leopards that do not change their spots, not changeable chameleons.

Complaints about the ambiguity of the word "willful" stretch back generations and come from the highest authorities. The Supreme Court of the United States stated "willful" is a " 'word of many meanings,' and 'its construction [is] often ... influenced by its context.' " (*Ratzlaf v. U.S.* (1994) 510 U.S. 135, 141 (quoting *Spies v. United States* (1943) 317 U.S. 492, 497).)

Judge Learned Hand spoke about the word "willfully."

When Judge Hand spoke, people listened.  (Cf. Posner (1994) *The Learned Hand Biography and the Question of Judicial Greatness* 104 Yale L.J. 511, 511 ["Learned Hand is considered by many the third-greatest judge in the history of the United States, after Holmes and John Marshall, some might even rate him higher"]; *id.* at p. 524 ["Hand was one of the best judges ever"].)

Judge Hand said "wilfully" is "a very dreadful word. . . .  It's an awful word!  It is one of the most troublesome words in a statute that I know.  If I were to have the index purged, 'wilful' would lead all the rest in spite of its being at the end of the alphabet."  (Model Pen. Code (1985) § 2.02 cmt. 10 n. 47 [quoting 1955 comments of Judge Learned Hand at the American Law Institute proceedings, internal quotation marks omitted].)

Respected authorities share Judge Hand's view.  (See Model Pen. Code, § 2.02 Explanatory Note p. 228 ["willfully" is "unusually ambiguous standing alone"]; Weinreb, Comment, in 1 Working Papers of the National Commission on Reform of Federal Criminal Laws 105, 120, 125, 128 (1970) ["The courts, including the Supreme Court, have endowed the requirement of willfulness with the capacity to take on whatever meaning seems

appropriate in the statutory context. . . . There may be no word in the Federal criminal lexicon which has caused as much confusion as the word 'willfully' (or 'willful')"]; Davies (1998) *The Jurisprudence of Willfulness: An Evolving Theory of Excusable Ignorance* 48 Duke L.J. 341, 349 ["genuine searches for evidence of the intended meaning of 'willfully' will often require the courts to go beyond statutory text"].)

The famously ambiguous "willfully" requires a clear and precise interpretation. "It is emphatically the province and duty of the Judicial Department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule." (*Marbury v. Madison* (1803) 5 U.S. 137, 177.)

B

Second, it is best to avoid the terms "general intent" and "specific intent." The Supreme Court identifies these terms as confusing and unnecessary. (See *People v. Hering* (1999) 20 Cal.4th 440, 445 [The terms specific and general intent have been difficult to define and apply and even perhaps have proved to be mischievous. "In any event, courts should avoid rote application"]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1126–1127 ["The division of crimes into two categories, one requiring 'general intent' and one 'specific intent,' is both simplistic (some crimes have other required mental states such as knowledge) and potentially confusing"]; see also *Canales, supra*, 106 Cal.App.5th at pp. 1251–1255; CALCRIM p. xxii [CALCRIM instructions "do not use the terms general and specific intent"].)

When the search is for clarity and precision, the phrases "specific intent" and "general intent" cannot solve the problem. They merely compound confusion.

15

C

Third, courts should look to the four precise mental state definitions in the Model Penal Code, as our Supreme Court has done. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 173 (*Cel-Tech*) [the Model Penal Code has "defined four distinct culpable mental states": purpose, knowledge, recklessness, and negligence]; see Model Pen. Code, §§ 2.01, 2.02; see also *People v. Clark* (2016) 63 Cal.4th 522, 617 & fn. 73 (*Clark*).)

When seeking accuracy in defining mental states, courts benefit from the watershed achievement of the Model Penal Code.

After a decade of study and debate, in 1962 the prestigious and nonpartisan American Law Institute promulgated the Model Penal Code.

The Model Penal Code clarified the confused jumble of words courts previously had used to refer to the mental elements of crimes.

This confused jumble was a problem that was real, and serious. When the consequences are criminal liability and the possibility of incarceration, legal precision and predictability are desirable—and were missing.

The renowned decision of *Morissette v. United States* (1952) 342 U.S. 246, 252, for instance, decried the "variety, disparity and confusion of [court] definitions of the requisite but elusive mental element." Indeed, one study counted *76 different mental state formulations* in federal statutes alone. (Model Pen. Code, § 2.02 p. 230 n. 3.)

Clear specification of mental states had been no easy task for the law. "Often courts used epithets to identify the culpable state required, epithets such as *willfully*, maliciously, wantonly,

16

or corruptly." (Kadish, *Fifty Years of Criminal Law: An Opinionated Review* (1999) 87 Cal. L.Rev. 943, 952 (*Kadish*), italics added.) The vagueness of these labels and others like them created a "long tradition of dizzying uncertainty . . . ." (*Ibid.*)

The Model Penal Code's mental state definitions offered clarity in a field long plagued by imprecision. They "dissipated these clouds of confusion with an astute and perspicuous analysis that has been adopted in many states and has infused thinking about mens rea everywhere." (*Kadish, supra,* at p. 952.) "[A]s a result of the [Model Penal] Code, . . . [t]he fog that surrounded centuries of controversy over the requirement of mens rea has been lifted, one hopes, permanently." (*Id.* at p. 981.)

The respected Judge Gerard E. Lynch of the Second Circuit Court of Appeals, who is also the Paul J. Kellner Professor of Law at Columbia Law School, wrote that "all criminal law scholars understand [that] the Model Penal Code is one of the great intellectual accomplishments of American legal scholarship of the mid-twentieth century." (Lynch, *Revising the Model Penal Code: Keeping It Real* (2003) 1 Ohio St. J.Crim.L. 219, 219.)

The Model Penal Code's four mental states are purpose, knowledge, recklessness, and negligence. (Model Pen. Code, § 2.02, subds. (2)(a), (b), (c), (d).)

The Model Penal Code defined these four mental states with a lucidity that took the best legal minds in America ten years to perfect. In their precision of expression, these definitions possess beautiful utility. These definitions are as follows.

"A person acts *purposely* with respect to a material element of an offense when: (i) if the element involves the nature of his

17

conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist." (Model Pen. Code, § 2.02, subd. (2)(a), italics added.)

"A person acts *knowingly* with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result." (Model Pen. Code, § 2.02, subd. (2)(b), italics added.)

"A person acts *recklessly* with respect to a material element of an offense when he *consciously disregards* a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation from the standard of conduct that a law-abiding person would observe* in the actor's situation." (Model Pen. Code, § 2.02, subd. (2)(c), italics added.)

"A person acts *negligently* with respect to a material element of an offense when he should be aware of *a substantial and unjustifiable risk* that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves *a gross deviation from the standard of care that a reasonable person would observe* in the actor's situation." (Model Pen. Code, § 2.02, subd. (2)(c), italics added.)

18

Importantly, this definition of *criminal* negligence is more precise and more demanding than the *Lopez* opinion's cursory definition of negligence. The *Lopez* standard merely stated the *civil* definition of negligence, which requires no "gross deviation" from the standard set by the reasonable person. Nor did *Lopez* demand that the risk be "substantial and unjustifiable," as the Model Penal Code does.

The California Supreme Court has endorsed the utility of the Model Penal Code's effort. For instance, the high court has explained the difference between a defendant's *purpose* and a defendant's *knowledge*.

" 'Purpose' has a precise meaning. As an illustration, we may turn to the Model Penal Code. In that code, the American Law Institute drafters defined four distinct culpable mental states. None of the definitions uses the ambiguous word 'intent.' The code's two highest mental states are to act 'purposely' and to act 'knowingly.' (Model Pen. Code, § 2.02(1).) Persons act 'purposely' with respect to a result if it is their 'conscious object' to cause that result. (Model Pen. Code, § 2.02(2)(a)(i).) Persons act 'knowingly' with respect to a result if they are 'practically certain' their conduct will cause that result. (Model Pen. Code, § 2.02(2)(b)(ii).) The comment to the code explains the difference between purpose and knowledge. 'In defining the kinds of culpability, the Code draws a narrow distinction between acting purposely and knowingly, *one of the elements of ambiguity in legal usage of the term 'intent.'* Knowledge that the requisite external circumstances exist is a common element in both conceptions. But action is not purposive with respect to the nature or result of the actor's conduct unless it was his conscious object to perform an action of that nature or to cause such a

19

result.' (Model Pen. Code & Commentaries, com. 2 to § 2.02, p. 233, fn. omitted, italics added.) 'The essence of the narrow distinction between these two culpability levels is the presence or absence of a *positive desire* to cause the result; purpose requires a culpability beyond the knowledge of a result's near certainty.' [citation]." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 173, footnote omitted.)

The facts of the *Cel-Tech* case concretely illustrated the difference between a defendant's purpose and knowledge. A telephone company was charged with violating a statute prohibiting sales below cost. A question in *Cel-Tech* was the required mental state: purpose versus knowledge. Did the statute require proof the phone company had the *purpose* of injuring competitors, or would mere *knowledge* suffice to create liability? This distinction may seem subtle, but it made all the difference in the *Cel-Tech* situation, for proof of the latter was available but proof of the former did not exist. The evidence was the phone company *knew* its below-cost sales would hurt the competition, but this objective was not the company's *purpose*. Its purpose was simply to make money by expanding sales; it knew its success inevitably would hurt others, but that was not its goal. The *Cel-Tech* court held this statute required purpose. Knowledge was not enough. That distinction decided the issue. (*Cel-Tech*, *supra*, 20 Cal.4th at pp. 169, 174–175.)

Another Supreme Court case illustrated the difference between a defendant's *knowledge* and *recklessness*—a further distinction of crucial importance. In this illustration, Marjorie Knoller decided to bring her vicious, aggressive, unmuzzled 150-pound dog into contact with other people, knowing she could not control her dog, and knowing the dog posed a highly dangerous

20

risk to human life.  Knoller consciously disregarded this risk to human life.  This mental state would suffice to support a murder charge.  (*People v. Knoller* (2007) 41 Cal.4th 139, 152, 158.)  In other words, there was no need for prosecutors to prove Knoller *knew* her dog would kill someone.  Knoller's *recklessness* was enough.

The Supreme Court's *Clark* decision built the Model Penal Code's definition of recklessness into California state law.  (See *Clark*, *supra*, 63 Cal.4th at p. 617 & fn. 73.)

Criminal liability usually requires at least a reckless state of mind.  (See Model Pen. Code, § 2.02(3) & cmt. 5, p. 244 & n. 36.)  That is, the norm for criminal liability usually requires, and is satisfied by, recklessness.  Negligence is a *possible* criminal law standard.  But it is exceptional.

On recklessness, the classic teaching example is Russian roulette, where two willing players put one bullet in a six-shooter revolver and take turns spinning the cylinder, pointing the revolver at the other's head, and pulling the trigger.  (E.g., *Commonwealth v. Malone* (1946) 354 Pa. 180, 47 A.2d 445, 447–449 [affirming reckless murder conviction for a Russian roulette killing where the shooter pointed the gun at a consenting friend].)  Pulling the trigger creates a one-in-six chance of death.  One does not *know* the trigger pull will cause death.  But the act is *reckless*: by deciding to pull the trigger, the actor consciously accepts a substantial and unjustifiable risk.  This conscious awareness is more culpable than negligence, where the actor is merely *careless*, and less culpable than people who *know* their deeds will cause death.

Recklessness is a common standard in California criminal law.  California judges are familiar with, for instance, murder

21

convictions founded on recklessness.  (Cf. *People v. Reyes* (2023) 14 Cal.5th 981, 992 ["the trial court should have asked whether Reyes knew that Lopez intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was *dangerous to life, and acted in conscious disregard for life*"]; CALCRIM No. 520 element four [prosecution must prove defendant deliberately acted with *conscious disregard* for human life]; see also *Clark, supra,* 63 Cal.4th at p. 617, fn. 73 [California courts have recognized the Model Penal Code definition of recklessness in various areas of criminal law].)

Regarding *negligence,* the California Supreme Court again turned to the Model Penal Code to explain why a legislative decision to impose penal consequences for negligence can be intellectually, and constitutionally, comprehended.  (*People v. Rodriguez* (1986) 42 Cal.3d 730, 781 [quoting Model Pen. Code, § 2.02, com. at p. 243 at length].)

In sum, the Model Penal Code's four mental state definitions have stood the test of time, and have proven their utility and reliability over the course of many decades.  (See *Canales, supra,* 106 Cal.App.5th at pp. 1255–1262.)

The four mental state definitions embody no policy judgments.  They are simply neutral tools for clear judicial analysis.  Beyond these definitions, the Model Penal Code also proposed substantive statements of crimes.  These substantive statements incorporate legislative-style policy judgments.  (E.g., Model Pen. Code, § 242.2; Model Pen. Code Commentaries, Part II vol. 3, at pp. 216–218, 221 [surveying various policy debates relevant to the offense of resisting arrest].)  This case does not implicate these substantive policy debates or legislative judgments.

22

## D

Now, which of the four mental states is most appropriate for section 148, subdivision (a)(1)?

The answer is a minimum mental state of *recklessness*.

*A.L.*'s standard of "actual knowledge" is too high. A *reckless* person resisting arrest would be fully blameworthy. Once people are *consciously aware of a substantial and unjustifiable risk* that the person they are resisting is a law enforcement officer, they are not morally blameless. To demand a higher level of culpability when the Legislature has not expressly required it would be to demand superfluous culpability. Such a requirement "would serve only to make it more difficult to obtain convictions," which is "a policy with no apparent purpose." (*United States v. Feola* (1975) 420 U.S. 671, 694.)

Moreover, the word "actual" detracts from, rather than contributes to, the clarity of *A.L.*'s standard. That word "actual" raises the question of what knowledge is *not* actual. The metaphysical quality of this query does not add clarity to the Model Penal Code's exactitude.

So *A.L.* is out. "Actual knowledge" is not the right mental state here.

By the same measure, however, criminal negligence *as the Model Penal Code defines it* also may satisfy *Vogel*'s requirement of mandatory culpability. This is because the act of resisting is more culpable when reasonable people would have realized the person they are resisting is a police officer.

The Model Penal Code's specification of negligence is more demanding and more precise than the statement of civil negligence found in the decisions in *Lopez*, *Mackreth*, and *Serna*.

The Supreme Court has frowned upon the use of a civil negligence standard in criminal law. (See *People v. Penny* (1955) 44 Cal.2d 861, 879 [to impose criminal liability for a negligent act, there must be a higher degree of negligence than is required to establish negligent liability on a mere civil issue, because in criminal law the negligence must be aggravated].)

So *Lopez*, *Mackreth*, and *Serna* are out, too.

The Legislature is, of course, free to specify that negligence can support criminal liability. (E.g., § 246.3 ["any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense"].)

And the Supreme Court has, on occasion, selected negligence as the proper standard in cases following *Vogel.* (E.g., *Stark v. Superior Court* (2011) 52 Cal.4th 368, 401 ["We observed that the term 'willfully' has been interpreted in a number of statutory contexts as requiring more than mere volition in committing the prohibited act"]; *id.* at p. 412 ["the mental state for a violation of section 424 may be satisfied by actual knowledge or *criminal negligence* in failing to know the legal requirements governing the charged acts or omissions"] [italics added].)

Furthermore, there is some logic in employing the lowest standard in a case where the statute sets only misdemeanor liability: lower stakes for a lower level of culpability. (Cf. § 69 [a person who "knowingly resists, by the use of force or violence, the officer" in the performance of duty can be punished by imprisonment].)

24

But a misdemeanor conviction does remain a *criminal* conviction, which can have significant consequences for the person convicted of the crime.

The Model Penal Code, moreover, notes that *recklessness* is the default standard of the common law. And, as noted, negligence as a standard for criminal liability is the exception rather than the rule. (See Model Pen. Code, § 2.02, subd. (3); *id.* cmt. 5, p. 244 ["since negligence is an exceptional basis for [criminal] liability, it should be excluded as a basis unless explicitly prescribed"]; cf. *People v. Avery* (2002) 27 Cal.4th 49, 55 (*Avery*) ["to determine the exact nature of California's intent requirement, we must turn to the common law"].)

The criminal law only rarely bases penal liability on negligence of any kind. Incarceration and the stain of a criminal conviction are severe penalties. Our society generally reserves this harsh treatment for people who *make blameworthy decisions* rather than for those who are *merely careless*. (Cf. *Avery, supra,* 27 Cal.4th at p. 57 [referring to the seriousness of criminal penalties, and the fact that "criminal punishment usually represents the moral condemnation of the community"].)

Although the matter is not free from doubt, the best forecast is that the high court would apply the Model Penal Code's recklessness standard and not negligence to the resisting arrest statute. Otherwise, mere *civil* negligence would be sufficient for this *criminal* statute.

V

The foregoing analysis means that, when Gresham acted, he must have known, or at least *consciously disregarded a substantial and unjustifiable risk*, that Winter was a peace officer engaged in performing his duties.

25

The jury instruction was improper, for it did not require recklessness.  But the error was harmless by any standard.  (See *Chapman v. California* (1967) 386 U.S. 18, 24, 26.)  Gresham's view of an approaching man in full police uniform meant he consciously perceived a substantial and unjustifiable risk that he was resisting police officers.  The same inference also flows from Gresham's repeated statement "I didn't do nothing."

VI

In sum, all paths lead to the same destination for Gresham: we affirm this judgment.  But which path is legally correct?  For future interactions between police and the public, this matters.  Only our Supreme Court can resolve this conflict in the lower courts.

WILEY, J.